In re NORTHWEST LOUISIANA GAS CO., Inc., et al. (HOPE et al., Interveners).

Nos. 5847, 5848.

District Court, W. D. Louisiana, Shreveport Division.

Aug. 17, 1938.

Yandell Boatner (of Pugh, Grimmet & Boatner), of Shreveport, La., and Chadbourne, Wallace, Parke & Whiteside and Clair B. Hughes, all of New York City, for debtor.

Wise, Randolph, Rendall & Freyer, of Shreveport, La., and Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, Md., for interveners.

DAWKINS, District Judge.

On June 1, 1937, the Northwest Louisiana Gas Company, Inc. (hereafter called

the Northwest Company), and the Peoples Gas & Fuel Company, Inc. (hereafter called Peoples Company), each filed petitions for reorganization under Section 77B of the Bankruptcy Law, 11 U.S.C.A. § 207, which were on the same date approved as properly filed and ordered consolidated. Presented with the petitions was a common plan, which provided for the organization of a new corporation to take over all the assets of the two debtors; the elimination or exclusion of all stock from participation and the issuance of a single class of new common stock to creditors, as set forth in detail. The debtors were permitted to retain temporary possession, due notice was given and on June 29th hearing was had, at which the debtors were placed in permanent possession; classification of creditors was made, and the debtors were declared insolvent, with the consequent elimination of all stock from participation in the plan of reorganization. The hearing was continued through the 30th and protests sent to the court by certain creditors, particularly first mortgage bondholders of the Peoples Company, were ordered filed with the record. Evidence was adduced upon the fairness and feasibility of the plan and the matter taken under advisement.

Subsequently, further protests in the form of letters were received by the court against the plan of reorganization, based mainly upon the contention that it was prejudicial to the rights of the Peoples Company creditors. The court, of its own motion, appointed an expert accountant "to make an investigation from the evidence and exhibits filed in this cause, the books and records of the respective debtor companies, and otherwise as may be necessary, with particular reference to, (a) the intercorporate relations between the said debtor companies, including any contracts and all arrangements for the sale of gas or property by one company to the other; (b) the equitableness of the proposed allocation of stock in the new company to be organized pursuant to the plan among security holders of the respective debtor companies entitled to participate therein; (c) any other facts of the proposed plan of reorganization requiring examination in order to correctly appraise the feasibility and fairness thereof, and to make a report to the court of his findings and conclusions * * *".

Thereafter, formal oppositions were filed by various persons on October 22nd and 23rd, 1937, and on November 5th applica- tion to intervene on behalf of a bondholders' committee, headed by one November, was filed and the same was heard by rule directed to the debtors, on November 22, 1937, at which time permission was granted to oppose the plan of reorganization. The issues before the court are those presented by this opposition.

The report of the auditor or accountant was filed on February 24, 1938, and due notice given to all concerned. After postponement by consent, hearing was finally had upon the entire matter of the fairness and feasibility of the plan, at which the report of the auditor was offered, considered and the accountant who made it testified at length on the call of opponent's counsel.

The balance sheet of the Northwest Company, as of May 31, 1937, used as the basis for the plan, showed liabilities in the sum of $1,293,707.59, and assets valued at $556,556.34, or an excess of debts amounting to $737,141.25; whereas, a similar statement for the Peoples Company, showed liabilities of $1,367,857.56, and assets of $894,141.79, or that it owed $473,715.77 more than the value of its property.

The plan proposed excludes all stock of both companies from participation, for the reasons both are insolvent. It contemplates the formation of a new company, under the laws of Delaware, to be known as Peoples Gas & Fuel Corporation, which is to "acquire all the properties and assets" of the two debtors, for which it is to "assume the payment of the claims against and indebtedness of" the debtors, "and shall issue to the holders of securities" of the two companies "shares of common stock of such new corporation", on the following basis:

The Northwest Company:
Holders of First (Closed) Mortgage 6½% bonds,
For each $1,000............................ 10 Shares
Holders of unsecured notes,
For each $1,000............................ 1 "
Holders of General unsecured claims,
For each $1,000............................ 1 "
The Peoples Company:
Holders of First Mortgage 6½% bonds,
For each $1,000............................ 15 "
Holders of First Mortgage 6½% demand notes,
For each $1,000............................ 14 "
Holders of 5 yr. Gen'l Mortgage 7% Notes,
For each $1,000............................ 2 "
Holders of unsecured notes
For each $1,000............................ 1 "
Holders of general unsecured claims,
For each $1,000............................ 1 "

All of the common stock of the new company is to have "full voting rights". It is authorized to issue 25,000 shares, of which 20,304 shares shall be "outstanding"; and the first board of directors is to "be designated" by the boards of the two debtors, or to be provided otherwise "as the court may approve", to serve for six months "after consummation of the plan", when a board is to be elected by stockholders of the new company.

### Opinion.

The fairness of the plan, of course, has to be judged in the light of all the circumstances. The affairs of the two companies are so interrelated that each has been more or less dependent upon the other throughout their history of more than ten years, the Northwest operating mainly as a pipe line company, selling gas principally to industrial consumers, and to the Peoples Company at the gates of the towns and villages which the latter served as a distributor. The two were controlled by a holding company known as the Southwest Consolidated Gas Utilities Corporation (hereafter called the Southwest Company), which aided both of the debtors extensively in their finances and otherwise over the period of their existence.

As to the contention that it is unfair to the Peoples to join it up with the Northwest Company, because of the difference in earnings, it appears that while the former enjoys a situation by which it has connection through its own pipe line from the Monroe Gas field to the towns of Farmerville, Ruston, Downsville, Choudrant, Simsboro, Arcadia, Gibsland, Athens and Homer, it is dependent upon the Northwest Company for its supply at Haynesville, Spring Hill, Shongaloo, Sarepta, Cotton Valley and Gulfton. If the Peoples Company were entirely divorced from the other debtor, it would, of course, have to negotiate at arms length with the latter or induce some other pipe line company to provide the necessary facilities to furnish the gas for distribution in the last mentioned municipalities. If the Northwest Company were unsuccessful in retaining the business of the Peoples, then it too would have to seek other outlets for its gas. The two debtors have common creditors, both secured and unsecured, of such volume that under the plan, those occupying this situation, are to receive approximately 12,000 shares (59%) of the entire issue of 20,308 shares, which represents the whole number to be outstanding in the new company, if the plan of reorganization is approved; while 6,115 shares are to go to creditors of the Peoples Company alone and 2195 shares to those of the Northwest Company which have no interest in the other debtor.

Under the plan, the estimated operating profits which the two debtors would produce for the new company, are respectively, $10,516.75 (20%) for the Northwest, and $42,562.87 (80%) for the Peoples. Actual experience during the calendar year 1937 showed gross operating profits of $18,915.63 for the Northwest, and $88,335.16 for the Peoples, but the accountant appointed by the court has eliminated what he terms non-recurring items of revenue to each company, which reduces these figures to $15,100 and $67,000, respectively, or a showing of 18½% for the Northwest Company, and 81½% for the Peoples Company, as the results of the calendar year 1937. This, of course, is just 1½% short of the estimate in so far as the Northwest is concerned, and correspondingly greater as to the Peoples, which demonstrates a rather close calculation on the part of those who worked out the plan.

On the basis of appraised assets going into the new company, which has not been seriously discredited, the Northwest is to contribute 40% and the Peoples 60%; whereas, in striking an average, taking into consideration both assets and earning power, the figures used were 30% and 70%, respectively, for purposes of stock distribution to all classes of creditors. However, as between the first mortgage bondholders of the two companies, 15 shares were allocated for each $1,000 of bonds in the Peoples Company and only 10 shares to those of the Northwest, which is, of course, a 50% advantage to the former. Fourteen shares for each $1,000 is given for bonds of the Peoples Company, secured by a mortgage on the Ruston-Arcadia pipe line. These bonds are held by the Southwest Company or its stockholders, who are likewise large creditors of both the Peoples and the Northwest. In the course of their operations and to protect the financial standing of both debtor companies under their respective bond obligations, the Southwest or its predecessor, surrendered to the Northwest Company $194,805 of first mortgage bonds and $293,185 of five-year mortgage bonds, or a total of $487,990; and to the Peoples Company, $74,352 of first mortgage bonds and $78,105 general mortgage

bonds, or a total of $152,457.50, and making a grand total of $640,397.50, for which it accepted the plain notes of the debtors, thereby waiving the liens which had previously been enjoyed as holders of these securities. In the plan, the Northwest, or the holders of these notes, are credited with only one share per thousand dollars along with the other ordinary and unsecured creditors of both companies, with the result that the present holders of first mortgage bonds and five-year mortgage bonds have been benefitted to the extent in round figures of $640,000, in the reduction of prior lien claims which would otherwise have participated in the higher brackets of distribution of stock. Of course, technically speaking, in a liquidation and distribution of the assets of the debtors, the holders of these unsecured obligations would be limited to the rights which they now hold by the voluntary action thus taken. However, but for the inter-company relations between the two debtors, and the parent or holding company, which was able to protect the combined financial set-up, it appears that neither the Peoples nor the Northwest would have been able to continue and bankruptcy might have intervened long before these proceedings were initiated.

The stock proposed to be given unsecured creditors, including the notes which represent the bonds surrendered to both companies, amounts to about 6% of the entire issue. The statement of assets and liabilities prepared by the accountant (Tillotson, a public accountant who had for some ten years been employed to audit the books of the companies) showed what are termed "unpledged" or unencumbered assets, as follows:

Peoples Company:
| | |
|---|---|
| Cash on hand and on deposit.. | $32,439.74 |
| Debts due on open accounts... | 6,795.86 |
| Inventories of material and supplies | 19,484.83 |
| Sinking Fund Deposits......... | 296.77 |
| Miscellaneous Assets .......... | 1,028.04 |
| | $ 60,045.24 |

Northwest Company:
| | |
|---|---|
| Cash on hand and on deposit.. | $36,171.81 |
| Debts due on open account.... | 12,262.26 |
| Inventories of material and supplies | 2,432.34 |
| Stocks, bonds and other securities | 2,198.00 |
| Sinking Fund Deposits......... | 1,199.83 |
| Miscellaneous Assets ......... | 2,011.51 |
| | $ 56,275.75 |

| | |
|---|---|
| Total unpledged assets............... | $116,320.99 |

The auditor did not actually check materials, etc. but stated, in view of his long experience in auditing the affairs of the debtors and in further view of the fact that collections upon open accounts had shown not more than a 3% loss, he thought the valuations used in the balance sheets, forming the basis of the plan, were substantially correct. Bubenzer, engineer for the debtors, also swore that he believed the values placed upon the entire properties were fair and reasonable and were in line with figures used on other occasions for rate-making purposes before the State Public Service Commission, and in hearings before a statutory federal court of three judges when proceedings were brought to restrain reduction by the State Commission.

There appears to be no serious attack on these values, and I accept the figures, both as a whole and with reference to these unencumbered assets as being substantially correct. In liquidation, of course any deficiency in satisfying claims of bondholders would stand on the same basis as unsecured claims, and each would participate ratably in the assets upon which no lien existed in favor of a particular creditor. Since the entire property is to be transferred to the new company and all new stock is to have equal rights, the unsecured creditors are, to the extent of the free assets, surrendering their right to have these presently applied, ratably to their claims, and are to that extent contributing to the value of the stock, including that of the bondholders.

In the stock distribution, the book values of the new stock to the various first mortgage creditors, based upon the face amounts of their claims under the plan, are as follows:

| | Principal Amount of Claims | Book Value of Stock | Percent of Principal |
|---|---|---|---|
| Peoples: | $818,000 | $849,981.80 | 104% |
| Northwest: | $549,500 | $380,656.10 | 70% |
| Peoples: Ruston-Arcadia P. Line | $ 90,000 | $ 87,284.20 | 97% |

This discloses a substantial concession to the bondholders of the Peoples Company (who are the opponents here) as it has the effect of giving them a proportionately larger participation in the combined assets of the two debtors. Comparing the gross net assets of the two companies of (round figures) $1,400,000, with unpledged assets of (round figures) $116,000, we find the

latter to be approximately .0843% of the former and all things considered, there does not appear to be any discrimination as between secured and unsecured creditors in the allocation of stock to justify a court in declining to approve the plan on that basis alone, especially where it appears that more than 70% of all classes have accepted it.

The new company will have a pipe-line system of its own, extending east into the Monroe gas field, as well as another on the west, which taps the Webster Parish gas producing area. This will enable it to avail itself of the competition in prices for gas coming from both sections; whereas, if the Peoples were reorganized separately, it would be dependent upon the Monroe field alone for its needs in supplying the first group of municipalities named above, and for those last mentioned, as heretofore pointed out, entirely new arrangements would have to be made. Naturally, it is a matter of prophecy or speculation as to what the cost of gas in either direction will be and as to what the Peoples would be able to do in obtaining its supply in the western field. It is the judgment of those who have been handling the affairs of the two companies in the past, and which has the approval of the percentages of the creditors above stated, that consolidation into one company will be for the ultimate best interests of both. There ought to be some saving also in overhead expenses of a single unit as against those of the two debtors. No convincing proof to dispute that offered by proponents of the plan has been submitted, and in the light of all the circumstances, I conclude that the plan, as to this feature, is not unfair to the creditors of either group, but on the contrary, should prove beneficial.

In addition to the points covered thus far, opponents assert that the plan is "designed to benefit the interests of the present management by the allocation of stock"; that the Northwest was "paid interest on its bonds on May 31, 1937", after its petition for relief in these proceedings had been filed; "the management has never satisfactorily explained the reduction in rates applicable to the Peoples Company, after winning a contest to prevent the Public Service Commission from reducing rates"; nor has the "gross differences between estimates and actual results, as shown on the prospectus, under which the Peoples bonds were issued" been explained.

Considering these matters in the order stated, the record shows, as demonstrated by the report of the auditor appointed by the court, the Southwest Company (of which the management, Belchic and Laskey, owned the controlling interest) will receive 33% of the stock allocated to creditors of the Peoples and 38% of that awarded to those of the Northwest Company; while other and outside interests will be given 67% and 62%, respectively. This is far short of control, and it must not be overlooked, as disclosed earlier, the Southwest has already surrendered more than $640,000 of lien securities for ordinary notes.

As to payment of interest on first mortgage bonds of the Northwest Company, it is sufficient to say that the same thing was done with respect to the first mortgage bonds of the Peoples Company, and since these classes of creditors are to receive the lion's share of. the new stock, I think any contention of irregularity on that score is largely theoretical and certainly not prejudicial to either.

Mr. Belchic, Vice-President of the Peoples Company, who is' also a graduate geologist and petroleum engineer, testified that it was compelled to reduce rates in order to prevent other concerns or municipal authorities of the places served by the Peoples Company, from building competing systems; that discoveries of gas deposits in close proximity made it possible that this might be done and "we felt to preserve the corporation and protect the bondholders we should reduce our gas rates for domestic consumption to a point that would preclude competition". We may also take knowledge of the fact of discovery of a number of gas-producing fields in the northwest Louisiana section, where the principal properties and operations of these companies are located. Nothing was offered to dispute the testimony of Mr. Belchic, and I am of the opinion that this ground of opposition must also be overruled.

The attack upon the management, certainly in so far as salaries drawn by the two chief executive officers, Belchic and Laskey, are concerned, does not appear to be justified. They were each drawing $960 per year from the Northwest Company and $1920 per year from the Peoples Company. It is true that the figures shown in the prospectus of the Peoples Company upon which bonds were sold back in the late 1920's, did not pan out in so far as expens-

es were concerned, but this was the common fate of many other undertakings of those "whoopee" days. The audits made by both the regular accountant (Tillotson), as well as the independent one appointed by the court for the purpose of these proceedings, not only failed to show any irregularities or misapplication of funds, but revealed, as above shown, large concessions by the said management or the company in which they held the largest interest (Southwest Company) for the benefit of the debtor companies.

If stockholders in the new company should be dissatisfied with the management of these gentlemen, they will have the opportunity, at the end of six months, to change it, since, as previously demonstrated, outsiders will have control of a considerable majority of the stock interests and a new board of directors is to be elected at that time.

My conclusion is that the proposed plan is fair, feasible and apparently to the best interests of the parties whose rights are involved and should, therefore, be confirmed.

Proper decree should be presented.